# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DORIS L. STEWART,

                **Plaintiff,**

                                        **Case No.: 2:16-cv-1213**
                                        **JUDGE SMITH**
     **v.**                                        **Magistrate Judge Jolson**

SECRETARY OF DEFENSE
ASHTON B. CARTER,

                **Defendant.**

## OPINION AND ORDER

Presently pending before the Court is Defendant's Motion for Summary Judgment. (Doc. 22). Plaintiff responded (Doc. 30) and Defendant replied (Doc. 31). The matter is fully ripe for disposition. For the reasons that follow, the Defendant's Motion for Summary Judgment is **GRANTED.**

## I.      FACTUAL BACKGROUND

This case arises out of Plaintiff Doris L. Stewart's ("Plaintiff" or "Ms. Stewart") employment with the Defense Finance and Accounting Service ("DFAS"). (Doc. 1, Compl. at ¶ 6). Plaintiff filed this action bringing claims for race, color, and sex discrimination against Defendant Secretary of Defense Ashton B. Carter ("Defendant")—in his official capacity. Plaintiff is currently employed at DFAS, Columbus and has worked for some subsection or entity of the Department of Defense ("DOD") since 1984.

This case involves several alleged conflicts between Plaintiff and several of Defendant's employees, who were both Plaintiff's co-workers and supervisors. Plaintiff filed a complaint of

discrimination on the basis of race with the Equal Employment Opportunity Commission ("EEOC") on September 14, 2015. (Doc. 1, Compl. at ¶ 13). In her EEOC Complaint, Plaintiff alleged nine factual bases for which she was entitled to relief. (Doc. 1-1, EEOC Decision at 1). Plaintiff claims that since 2013 she has been subjected to disparate treatment, a hostile work environment, and retaliation as evidenced by:

1. Denials of certification;
2. Removal from appointment as Security Manager;
3. All meaningful work withdrawn and assigned to others;
4. Denied access to special assignments and promotions;
5. False accusations and threats to co-workers that [Plaintiff] was going to take away their security credentials;
6. Ongoing offensive behavior by the System Manager;
7. Directed to engage in meetings with contract audit teams and senior management then denied access to the meetings by System Manager;
8. Accepted offer to a Command Center Lead Director position was withdrawn the following day due to the System Manager's influence; and
9. Reprised against for pointing out flaws in system security.

(Docs. 1, Compl. at ¶¶ 13, 14; 1-1, EEOC Decision at 1). On October 3, 2016, the EEOC rendered a final agency decision finding in favor of Defendant. (Doc. 1-1, EEOC Decision at 17–18). The EEOC neglected to decide whether Plaintiff established a *prima facie* showing of all her claims, instead finding only that Plaintiff failed to demonstrate that Defendant's proffered legitimate and non-discriminatory/non-retaliatory reasons were mere pretext for discrimination or retaliation. (*Id.* at 13).

Plaintiff filed her Complaint in this action on December 31, 2016. (*See* Doc. 1, Compl.). In her Complaint, Plaintiff alleges the same factual allegations asserted in her EEOC Complaint. (*See generally* Docs. 1, Compl. and 1-1, EEOC Decision). Plaintiff is an African-American woman and brings claims for disparate treatment discrimination, hostile work environment discrimination, and retaliation on the basis of race, color, and sex pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. Plaintiff claims that Defendant's conduct

"continues to cause [her] severe anxiety attacks and humiliation" and that she has sought ministerial counseling to deal with the effects of "[t]he continued threatening and hostile environment[.]" (Doc. 22-1, Stewart Dep. Ex. 2, Feb. 6, 2016 Dec. at 14) (hereinafter "Stewart Dec."). In addition, Plaintiff alleges that by 2017, she had developed borderline diabetes and a non-cancerous tumor—physical conditions that did not pre-date the alleged discrimination or ensuing complaint. (Doc. 23-7, Stewart Dep. at 202:18–25). Plaintiff suggests these conditions were attributable to the stress she endured as a result of her harassment, but admits that she and her doctor have not reached that ultimate conclusion together. (*Id.* at 199:4–19).

Each of Plaintiff's nine specific factual bases in support of her claims are further detailed below.

## A. Denial of Certification

The only certification that Defendant denied Plaintiff was a Security Plus certification. (Doc. 23-7, Stewart Dep. at 130:23–132:17). Defendant requires all individuals pursuing this certification to pass an examination. Prior to taking this necessary examination, Defendant provided Plaintiff with a study course to assist her with preparing for the examination. Plaintiff failed the examination. Plaintiff claims that the examination materially changed from that for which she prepared. Upon learning that the examination had changed, Plaintiff's supervisor—Ms. Hickman—inquired whether Plaintiff wished to retake the examination and offered to discount the cost of retaking the examination. Plaintiff expressed that she was not interested in retaking the examination. (*See* Doc. 22-1, Stewart Dep. Ex. 3, Apr. 18, 2016 Rebuttal at 13) (hereinafter "Stewart Rebut.").

Plaintiff complains that she failed the examination for three reasons. First, Plaintiff asserts that her supervisor, Wayne Hansen, did not allow her to study for the examination during

workhours. However, Plaintiff has not produced evidence beyond her own testimony that demonstrates that Defendant routinely allowed individuals to study for the examination during workhours. (*See* Doc. 30, Resp. at 7). Second, Plaintiff alleges that her co-worker, Guy Moran, and first-line supervisor, Leisha Hickman, kept her so busy that she was unable to study during workhours. Plaintiff further states that Mr. Moran's reason for doing so stemmed from his annoyance with Plaintiff over pointing out a security flaw. Lastly, Plaintiff asserts that the DOD— or some entity thereof—materially changed the examination so as to impede her from attaining the Security Plus certification and block her from retaining her position as a security manager.[1] (*See* Doc. 22-1, Stewart Rebut. at 13).

Defendant admits that Plaintiff was denied a Security Plus certification. However, Defendant insists that the DOD did not conspire to block Plaintiff from attaining the Security Plus certification. Defendant insists that Plaintiff was denied the clearance simply because she failed the examination. Defendant draws the Court's attention to another individual—Fauzia Chuhdray, a brown-skinned woman—who twice took the examination and twice failed. Like Plaintiff, Ms. Chuhdray has never attained a Security Plus certification because she never passed the required testing.

**B.** **Removal from ISSM Appointment**

Plaintiff was appointed as the DCMS ISSM on December 30, 2013. (Docs. 30-3, Moran Dep. Ex. 5 DCMS ISSM Appt. Letter; 22-2, Ex. 1, April 8, 2016 Hickman Dec. at 3). Upon appointment to ISSM for DCMS, Plaintiff did not receive a salary increase; her work hours were

---

[1] "Security manager" is a term used within the DFAS to refer the official title of Departmental Cash Management Systems Information System Security Manager ("DCMS ISSM"). (Doc. 22, Mot. at 2).

not officially changed; she did not supervise more individuals; and she did not receive any other material benefits. (Doc. 23-7, Stewart Dep. at 134:8–135:1).

Individuals without a Security Plus certification could not remain in the ISSM position for longer than six months. (*See* Docs. 22-1, Stewart Rebut. at 12–13; 22-10, April 10, 2016 Hansen Dec. at 3; 22-2, Hickman Dec. at 4; 22-3, June 6, 2016 Nelson Dec. at 8). Thus, as Plaintiff never attained her Security Plus certification, Plaintiff's term as ISSM would expire no later than June 30, 2014. Plaintiff complains that Defendant, through his employees, began to discriminatorily remove her from the ISSM position on April 30, 2014. The DCMS ISSMs typically worked on two systems: Mainframe and Mid-Tier. (Docs. 23-2 Hickman Dep. at 22:22–23:5; 23-3, Moran Dep. at 32:25–33:1). On April 30, 2014, Mr. Moran updated Plaintiff's job placement so that she would serve as ISSM for Mainframe only, effectively halving Plaintiff's job responsibilities. (*See* Docs. 22-15, Mar. 25, 2016 Moran Dec. at 7).

Plaintiff asserts that Mr. Moran withdrew her appointment as ISSM to Mid-Tier because he was angry that Plaintiff had pointed out security flaws in the Mid-Tier system. (Doc. 22-1, Stewart Dec. at 7–8). Plaintiff states that the temporal proximity between the resolution of the Mid-Tier security flaws and Mr. Moran modifying her job placement to ISSM for Mainframe only, serves as evidence of Mr. Moran's discriminatory motives for the ISSM modification. Defendant rebuts Plaintiff's narrative and asserts that the System Manager, with the support of Plaintiff's supervisor, Ken McTyer, updated Plaintiff's job placement due to the culmination of several circumstances, none of which were discriminatory or retaliatory. Rather, Defendant states that Plaintiff was unable to keep up with the heavy workload of both systems, and—because Plaintiff was not previously trained in the Mid-Tier system—she was struggling with the work for Mid-

Tier. Mr. Moran asserts that he planned to appoint Ms. Chuhdray to ISSM for Mid-Tier; however, that never came to fruition.

Plaintiff alleges that her discriminatory removal continued in May 2014, when Plaintiff's supervisor, Ms. Hickman, began to search for Plaintiff's replacement. However, Ms. Hickman did not begin this search until after Plaintiff: 1) failed the Security Plus certification examination; and 2) indicated that she did not intend to retake the examination. Plaintiff was officially removed from the ISSM position on June 11, 2014, slightly less than three weeks before Plaintiff's term was set to expire on June 30, 2014. Plaintiff was replaced in the position by Tracy Nelson—a white female who held a Security Plus certification prior to her appointment as ISSM. Upon her appointment to DCMS ISSM, Ms. Nelson served as the ISSM for both Mainframe and Mid-Tier.

## C.     Withdrawing All Meaningful Work from Plaintiff

Plaintiff alleges numerous incidents which she claims support her allegation that Defendant withdrew all meaningful work from her. These incidents can be sorted into four categories: 1) the Green Belt project; 2) the alleged behavior of Mr. Moran to frustrate Plaintiff's ability to do her job; 3) denial of access to certain computer systems; and 4) Plaintiff's training of Kirk Shelby. Importantly, Plaintiff also attested to the fact that she was overworked to the point where she did not have time to sufficiently study for the Security Plus certification exam (Doc. 22, Stewart Dep. at 92:19–21).

### 1.     The Green Belt Project

Plaintiff claims that the Mr. Layton, the original coach for the Green Belt project, had deemed the project as "doomed to fail." (Doc. 23-7, Stewart Dep. at 58:10–15). After hearing this, Plaintiff contacted her supervisor—and the project owner—Ms. Parsons; Ms. Parsons disagreed with Mr. Layton's assessment. (*Id.* at 59:7–14). While working on the project, Plaintiff

claims she had a difficult time determining what management's goals were for the project, describing Mr. Layton as "unavailable and unwilling [ ] to coach" her. (*Id.* at 60:8–9). Plaintiff states that Mr. Layton would decline meeting invitations despite his schedule being clear or he would, at the last minute, cite an emergency and be unable to attend a meeting. (*Id.* at 60:8–22).

As of December 12, 2017, the Green Belt project was still ongoing and Plaintiff was still assigned to the project. (*Id.* at 62:2–12). Mr. Layton was no longer actively involved with the project but was still named as the project coach. (*Id.* at 63:4–9). Ms. Parsons had "assumed the project, as far as coaching it, running it, [and] leading." (*Id.* at 62:2–12).

Ms. Parsons states that she asked Plaintiff to be the lead on the Green Belt project and that there was "misdirection" between Plaintiff and other team members. Some of the team members complained of Plaintiff's leadership, with one individual stating that the meetings "were in chaos" after Ms. Parsons delegated leadership to Plaintiff. (Doc. 23-5, Parsons Dep. at 32:15–20). Another felt as if Plaintiff was keeping information from her. (*Id.* at 31:9–33:17). Further, Ms. Parsons asserts that, at some point, Plaintiff conveyed to the others that the Green Belt project had been canceled when it had not been. (*Id.* at 34:12–35:6).

Ms. Parsons acknowledges that Plaintiff came to her with concerns that Mr. Layton did not attend most of the meetings and that Mr. Layton was not wholly involved with the project. Ms. Parsons asserts that a new coach has since been assigned to the project and that, as such, she has dealt with many of the problems that Plaintiff has brought to her attention. (*Id.* at 37:16–39:19).

Plaintiff has not received any disciplinary action as a result of the Green Belt project, nor has she been threatened with reprisal because of this project. Likewise, Plaintiff has not complained of any loss of material benefits due to her involvement with this project. (*See* Doc.

23-7, Stewart Dep. at 62:14–22).  The only "negative consequence[]" that Plaintiff complains of is the disorganization of the project, which resulted in "chaos and confusion."  (*Id.* at 62:17–20).

### 2.    Mr. Moran's alleged behavior

As more thoroughly discussed below, Plaintiff alleges a longstanding tenuous relationship between herself and Security Manager Guy Moran.  Here, Plaintiff complains that Mr. Moran has impeded her ability to successfully complete her required work assignments since 2013.  Plaintiff complains that such impediments have destroyed her reputation and hampered her ability to receive special assignments and promotions.  (Doc. 22-1, Stewart Dec. at 8, 13).  Plaintiff generally alleges that Mr. Moran routinely objected to what she was doing or found ways to frustrate her purpose, belittled and marginalized her, and painted her to be "an angry black woman" to others in the office.  (*Id.* at 8).

Plaintiff alleges that the bifurcation of the DCMS ISSM position, discussed *supra*, is also evidence of Mr. Moran discriminatorily removing work from her.  After her removal from the ISSM position, Plaintiff claims that the harassment continued.  According to Plaintiff, in October 2014, while Plaintiff was Configuration Manager ("CM") for DCMS, Mr. Moran reassigned a project that was rightfully hers to a white female CM from a different system.  (Doc. 22-1, Stewart Dec. at 9).  Plaintiff claims that the other CM completed the assignment—a test plan template— incorrectly and that such template has been in use since 2014 despite Plaintiff offers to personally correct or recreate the test plan template.  (*Id.*).

Plaintiff's next allegations center around a series of interconnected incidents in autumn 2015.  Plaintiff states that Mr. Moran systematically depleted her work assignments.  (Doc. 22-1, Stewart Rebut. at 26).  While Darryle "Lee" Gross served as Plaintiff's supervisor, Mr. Gross delegated the duty of assigning work to Mr. Moran; but Mr. Gross did not delegate any of his

supervisory duties to Mr. Moran. (Doc. 22-4, Gross Dep. at 19:20–20:15). It appears that on or before, October 19, 2015, Plaintiff voiced concerns to Mr. Gross that Mr. Moran would not assign Plaintiff any meaningful work. (Doc. 30-2, Gross Dep. Ex. 6). Mr. Gross, in turn, reached out to Mr. Moran and instructed Mr. Moran to provide Plaintiff with "meaningful work." (Doc. 22-4, Gross Dep. Ex. 10). Mr. Moran responded stating that Plaintiff did not have the proper qualifications to complete much of the workload that currently needed to be done and that he was having difficulties finding work that Plaintiff could complete. After some back and forth, on November 6, 2015, Mr. Gross wrote a detailed email to Mr. Moran instructing him to find Plaintiff work that she could do and to make sure that work was "meaningful." Mr. Gross' November 6, 2015 email, in full, states:

> I understood you to say, per you [sic] last two messages, that you do not have any meaningful work to assign to Doris Stewart in DCMS.
>
> Please take a few moments and seriously reconsider this position. it [sic] is my job to insure that all resources assigned to ZTCCB are actively and meaningfully employed. If at all possible, I want you to find her something to actively work on. I have gone on record with telling all that you, as the SM, are responsible for delegating out the day-to-day work taskings for DCMS. For you to continue to ignore Doris in not giving her assignments to work on simply augments her case against you and DFAS in this area of claiming discrimination in assigning work to her. From what I can gather, she is claiming being blocked from Customer Contact, being kept out of the loop on FISCAM and Audit efforts, and not being able to do her Job as a CM. However, she seems to think she can be the RM.
>
> I have been advised that we cannot move her to another project, or put her on special assignment without her consent. To do so could be considered retaliation; we shall will [sic] not go there. Since she is ours to employ on DCMS, you must consider what she can do and get her started doing it. And "it" must be meaningful work. If she was the ISSM before, why can't she be the ISSM again? If you tell me she couldn't do the job, then what did you do with her, make her the RM & or [sic] the CM? At what point do we say she can't do her appointed job, and we then have to either put her on a Performance Improvement Plan (PIP), requiring documentation, or something. Unfortunately, I think she is holding the stronger hand right now, due to lack of documentation. I think we need to give her meaningful work, and document her failures, as they occur.

> If you still cannot find anything for her to do, let me know. I want you to take the time to lay out for me, what every other person in DMCS normal role is, and what their day to day activities encompass. It's alright to say she can't program, but that doesn't mean she can't test FISCAM, or be a RM, or a CM, and be successful.
>
> Provide this information by COB 11/13/15, or assurances that you have found her work to do.

(Doc. 30-2, Gross Dep. Ex. 12). One week later, Mr. Moran appointed Plaintiff as the DCMS Main Frame Configuration and Release Manager and requested that Plaintiff aid with a Black Belt project. (Doc. 30-3, Moran Dep. Ex. 20). Thus, it was approximately three and a half weeks from the time Plaintiff first informed Mr. Gross of her lack of "meaningful work" and her being assigned "meaningful work."

### 3. Denied access to computer system/program

Plaintiff claims that in late-2016 or early-2017, Defendant denied her access to certain computer programs—such as "eMASS"—which interfered with her ability to complete a special assignment. (Doc. 30, Resp. at 7) (citation omitted). Plaintiff states that she needed access to eMASS to be able to complete her special assignment and that without access to eMASS, completing the job was like working "with [her] hands tied behind [her] back." (Doc. 23-7, Stewart Dep. at 46:20–21). Plaintiff contends that she completed the necessary form to get eMASS access and gave that form to her supervisor, Ms. Parsons. However, Ms. Parsons stated that Plaintiff "couldn't have the access" to eMASS because Plaintiff was not the ISSM. (*Id.* at 45:13–16). Plaintiff obtained access to eMASS during the second month of her first special assignment. (*Id.* at 43:20–44:2).

Ms. Parsons states that Plaintiff's access to eMASS was terminated due to Plaintiff's inactivity on the system. (Doc. 23-5, Parsons Dep. at 68:4–6). Ms. Parsons states that the required form was submitted to the necessary person for Plaintiff to regain access to the eMASS system;

however, there was a delay in processing Plaintiff's request. (*Id.* at 7–13). Ms. Parsons asserts that Plaintiff did not need access to eMASS to complete the special assignment. As such, given the delay in getting Plaintiff's request processed, Ms. Parsons directed Plaintiff to complete the work by having the ISSM or SM download a spreadsheet which contains the controls and—after Plaintiff updates the spreadsheet, return the spreadsheet to the ISSM or SM to upload the update, until her access to eMASS request was processed. (*Id.* at 68:14–70:7). Furthermore, Plaintiff admits that she was able to complete the workload without access to the eMASS system. (*See* Doc. 23-7, Stewart Dep. at 42:14–24). Ms. Parsons states that while access to eMASS would not have been inappropriate, it was also not necessary. (Doc. 23-5, Parsons Dep. at 68:19–69:8). Ms. Parsons maintains that this did not create any extra work for the Plaintiff. (*Id.* at 70:19–71:2).

### 4. Training Kirk Shelby

Another point of contention is that while Plaintiff was serving as Configuration Manager ("CM"), Plaintiff's supervisor, Ms. Parsons, had Plaintiff train another individual—Kirk Shelby— to prepare him to serve as CM. It appears that sometime after Plaintiff trained Mr. Shelby, Mr. Shelby assumed the role of CM. (*See* Doc. 23-4, Nelson Dep. at 31:10–32:6). Plaintiff asserts that Ms. Parsons "removed *some of* Plaintiff's job duties and gave them to Kirk Shelby, a white male co-worker, who lacked experience. (Deposition of Abigail Parsons, March 13, 2018, pg. 84– 85)." (Doc. 30, Resp. at 10) (emphasis added). Thus, Plaintiff appears to acknowledge that not *all of* her job responsibilities had been removed during the time in which Mr. Shelby worked as the primary CM.

Ms. Parsons details this event differently. Ms. Parsons noticed that Plaintiff was the only person trained in the CM role and was concerned that nobody was adequately trained to serve as Plaintiff's back-up. Ms. Parsons stated that she likes to have at least two people trained in each

position in the event that the primary was unavailable, the back-up would be able to sufficiently handle any problems that arose during the primary's absence. As such, Ms. Parsons set out to train another individual—Mr. Shelby—to learn Plaintiff's CM role so that if Plaintiff was out sick or on vacation, Mr. Shelby would be able to adequately cover the position. So, Ms. Parsons had Plaintiff train Mr. Shelby and afterwards, for a period of time, Mr. Shelby served as the Primary CM while Plaintiff served as the back-up CM. Thus, during this temporary training period, Mr. Shelby and Plaintiff's roles were reversed. Plaintiff still retained some of her CM job responsibilities during this time and was to assist Mr. Shelby with the primary CM duties.

Ms. Parsons acknowledges that some of Plaintiff's CM responsibilities were reallocated to Mr. Shelby during this temporary training period which would result in a decline in Plaintiff's home system workload. But Ms. Parsons claims that to have given Plaintiff "additional workload" to supplement her home system workload. (Doc. 23-5, Parsons Dep. at 84:10–85:19).

**D.     Denied access to special assignments and promotions**

Plaintiff generally alleges that she was denied access to special assignments. (Doc. 22-1, Stewart Dec. at 1). However, the record indicates—and Plaintiff admits—that "Plaintiff has extensive experience and was tasked by Defendant to perform *multiple special assignments* with other offices, departments, and/or branches outside of her home system." (Doc. 30, Resp. at 6 (citing Docs. 23-5, Parsons Dep. at 44–47; 23-3, Moran Dep. at 75, 94); 18.[2] Plaintiff admits elsewhere that Ms. Hickman "moved me to outside special assignments over and over again." (Doc. 22-1, Stewart Rebut. at 19).

---

[2] "Plaintiff told Abigail Parsons that *she was given special assignments*, rather than work on her home system, as a form of punishment by Moran." (Doc. 30, Resp. at 18 (citing Doc. 23-5, Parsons Dep. at 101)).

Further, while Plaintiff draws the Court's attention to a large amount of alleged conduct in her Response to Defendant's Motion for Summary Judgment, Plaintiff has failed to point to any record evidence to support the contention that Defendant failed to promote her. (*See generally* Doc. 30, Resp.).[3] However, in Plaintiff's first Declaration, when asked what type of opportunities she had been denied, Plaintiff responded that she had "been deemed qualified for a GS-13 2210 position and have been referred to the selecting official. I have not been selected." (Doc. 22-1, Stewart Dec. at 13). Plaintiff states that withdrawal of workload—upon which her third factual allegation is based and is fully described *supra*—"placed [her] at a clear disadvantage for all promotional opportunities which would have had to occur outside of DCMS because there were no promotion opportunities within the home system." (Doc. 22-1, Stewart Dec. at 8).

Additionally, Plaintiff contends that, because her work assignments were being diverted to other individuals, she was stripped of opportunities that would lead to potential promotions and special assignments. However, the record also reflects that, when Plaintiff approached her supervisors with her concerns that she did not have enough to work on, her supervisors would routinely attempt to find more substantial work for Plaintiff. (Doc. 23-5, Parsons Dep. at 86:20–88:17). Even when Mr. Moran was slow to assign Plaintiff "meaningful work" in autumn 2015, the record reflects that shortly after Plaintiff contacted her supervisor, Mr. Gross, with concerns that she was not being assigned "meaningful work," Mr. Gross quickly contacted Mr. Moran and directed Mr. Moran to assign Plaintiff "meaningful work," as evidenced by Plaintiff being appointed DCMS Main Frame Configuration and Release Manager in November 2015.

---

[3] The Court acknowledges that Plaintiff points to the revocation of the Command Center Lead opportunity but, because Plaintiff alleges that separately from the more general failure to promote claim, the Court will discuss such alleged conduct below.

### E.      False Accusations

Plaintiff asserts that Mr. Moran spread a malicious rumor about her to at least one other individual affiliated with DFAS.  According to Plaintiff, Mr. Moran told a DFAS Customer, Diana Ritzert, that Plaintiff was planning on revoking Ms. Ritzert's security access.  (Doc. 30, Resp. at 17 (citing Doc. 23-6, Ritzert Dep. at 18)).  Plaintiff claims that Ms. Ritzert approached her about Mr. Moran's statement.  Ms. Ritzert allegedly informed Plaintiff that she did not believe Mr. Moran, but she wished to apprise Plaintiff of the situation.  (Doc. 22-1, Stewart Dec. at 4).

Ms. Ritzert's recollection of the conversation differs from Plaintiff's.  Ms. Ritzert states that she had a conversation with Mr. Moran in which he informed her that Plaintiff was telling others that "him or [Plaintiff] was going to remove some access."  (Doc. 23-6, Ritzert Dep. at 18:6–10).  However, Ms. Ritzert asserts that she does not remember "anybody saying we're going to remove your access."  (*Id.* at 18:11–12).  She merely remembers Mr. Moran saying that Plaintiff was telling others this information and that such information was not true.  (*Id.*).

### F.      System Manager's Alleged Offensive Behavior

Plaintiff additionally asserts that she was frequently harassed and belittled by Mr. Moran.  Plaintiff predicates this claim on her perception that alleged statements made by Mr. Moran and others were implicitly directed at her.

First, Plaintiff asserts that, on numerous occasions, Mr. Moran referred to her as an "angry black woman."  Despite these numerous alleged incidents, Plaintiff can only point to one specific date that Mr. Moran allegedly made this statement: during a 2014 FISCAM meeting in front of several witnesses.  Mr. Moran insists that he has never referred to Plaintiff as such.  Additionally, despite Plaintiff's contention that Mr. Moran made such comment about her in a meeting in front

of several witnesses, no one independently recollects Mr. Moran using such a term in reference to Plaintiff during the 2014 FISCAM meeting or at any other time.

Plaintiff also asserts that while Mr. Moran was speaking to another co-worker he made a comment along the lines of: "I loves me some Denzel Washington." Plaintiff states that Mr. Moran had not previously been speaking about film and had not been talking about other actors or actresses; rather, Mr. Moran merely stated the comment concerning Denzel Washington. (Doc. 23-7, Stewart Dep. at 157:11–19). Mr. Moran states that he vaguely recalls discussing film with another co-worker; the subject of Denzel Washington's filmography was discussed; and Mr. Moran expressed his appreciation for Denzel Washington's body of work. (Doc. 22-15, Moran Dec. at 6). No other person witnessed this statement.[4]

Plaintiff next alleges that Mr. Moran made an offensive comment regarding her appearance, and that she received certain work assignments because she dressed in a particular manner. In her Declaration, Plaintiff asserts that Mr. Moran made the "pretty dress" comment while she "was walking through [her project team] work area," yet no one other than Plaintiff remembers Mr. Moran making such a comment. However, in her deposition, Plaintiff states that no one witnessed Mr. Moran make this alleged comment. (Doc. 23-7, Stewart Dep. at 162:9–11). And Mr. Moran categorically denies ever having commented that Plaintiff received "special assignments because [she's] pretty and wear[s] all those pretty dresses." (Docs. 22-15, Moran Dec. at 15–16; 23-3, Moran Dep. at 55:25–56:1).

Plaintiff also asserts that Mr. Moran asked Plaintiff if she wanted to listen to the rapper Lil' Wayne with him. Plaintiff asserts this question was posed in front of a group of individuals and that she was the only African American individual in that group. Mr. Moran denies asking Plaintiff

---

[4] The co-worker to whom Mr. Moran was speaking has since retired and has not been deposed in this case.

if she wanted to listen to Lil' Wayne with him. Furthermore, no one has an independent recollection of Mr. Moran asking Plaintiff if she wanted to listen to the rapper with him.

Finally, Plaintiff states that on May 14, 2015, while Mr. Moran was speaking to a co-worker—or just after finishing a conversation with a co-worker—he commented: "I haven't been to the gun range lately." (*See* Docs. 23-7, Stewart Dep. at 157:20–25, 162:15–165:2; 22-1, Stewart Dec. at 4). Plaintiff concedes that: Mr. Moran did not say her name in association with this comment; she could not see Mr. Moran at the time he made the comment because there was a wall between them; and she was unable to identify who Mr. Moran was allegedly speaking to when the comment was made. (Doc. 22-1, Stewart Dep. at 157:20–165:5). Nevertheless, Plaintiff asserts that she is positive that this comment was a threat and that the threat was directed at her. Plaintiff admits to feeling frightened by the comment. Mr. Moran denies ever making such a comment. While Mr. Morn admits to owning at least one firearm, he contends he never made the alleged comment. Further, when asked, nobody recalled Mr. Moran making such a comment.

After Mr. Moran allegedly made this comment, Plaintiff informed her supervisor, Mr. McTyer. Plaintiff maintains that her supervisor approved her to telework 100% of the time until he could finish investigating Plaintiff's complaint about this comment. (Doc. 22-1, Stewart Dec. at 12; Stewart Rebut. at 15).[5] However, Plaintiff's supervisors assert that *nobody* has been formally approved to telework 100% of the time. Plaintiff's supervisor has however developed a telework schedule that allows Plaintiff to work from home for 60% of the time. Thus, Plaintiff works from home three days per week, and works at the office two days per week. The days that Plaintiff works in the office correlate to the days that Mr. Moran works from home. Thus,

---

[5] Beyond Plaintiff's own statements, the record is unclear as to whether Plaintiff had ever formally been approved to telework 100% of the time.

Plaintiff's supervisor maintains that he developed a work schedule that would limit interaction between Mr. Moran and Plaintiff. (*See* Doc. 23-1, Gross Dep. at 15:9–17:6, 23:9–25).

Nevertheless, Plaintiff asserts that she notified her supervisors of the alleged harassment, but her supervisors failed to resolve the issue. Plaintiff alleges that her supervisors' failure to respond to these alleged belittlements and threats reflects her employer's condonation of what Plaintiff alleges to be a hostile situation. (*Id.*).[6] However, Mr. McTyer states that he did conduct a thorough investigation and that he was unable to verify any of Plaintiff's claims. Mr. McTyer maintains that Mr. Moran denied making all the comments Plaintiff attributes to him and nobody remembers Mr. Moran making such comments; as such, it essentially turned into a he said/she said situation. (Doc. 22-9, McTyer Dec. at 3).

G.     **Plaintiff denied access to required meeting**

Plaintiff's factual basis stems from an audit readiness meeting that occurred on May 13, 2015. Plaintiff was informed that her presence was required at the meeting. (Doc. 23-7, Stewart Dep. at 71:9–10). Nonetheless, Plaintiff reached out to her supervisors to verify that she was required to attend the meeting and her supervisors confirmed that her attendance was necessary. (*Id.* at 71:12–13). On the day of the meeting, Plaintiff proceeded to the meeting room. However, before she could enter the room, Mr. Moran gestured to Plaintiff and she stopped short of entering the meeting. (*See* Doc. 23-7, Stewart Dep. at 72:3–7, 77:20–78:7). Plaintiff contends that Mr. Moran waited for a group of people to enter into the room before he spoke with her. (*Id.* at 72:8–9). According to Plaintiff, Mr. Moran blocked the doorway—thus, inhibiting Plaintiff's entry into the meeting room—and loudly, and in an offensive manner, asked Plaintiff why she was at the

---

[6] "Therefore, our management chain is also responsible for the harassing activity in my opinion. Their lack of attention to these extreme issues of concern feels as if they condoned his behavior." (Doc. 22-1, Stewart Dec. at 10).

meeting as her presence was not required.  (*Id.* at 72:10–13; 77:20–78:7).  Plaintiff informed Mr. Moran that she was instructed by her supervisor to attend.  (*Id.* at 74:22–23, 79:5–6).  She then stepped around Mr. Moran, entered the meeting room, and took her seat.  (*Id.* at 73:16–19).

After Plaintiff took her seat, Mr. Moran angrily reentered the meeting room, gathered his belongings, left the meeting, and did not return until the next day.  (*Id.* at 73:21–23; Doc. 23-2, Moran Dep. at 78:8–9).  Mr. Moran states that he left the meeting because his blood pressure had skyrocketed and he needed to visit the onsite nurse.  (Doc. 23-3, Moran Dep. at 75:17–21).

Sometime during the meeting, and despite Mr. Moran never returning to the meeting, Plaintiff left.  (*See* Doc. 22-6, Ritzert Dep. Ex. 1, Ritzert Dec. at 3).  Plaintiff claims to have felt humiliated by Mr. Moran's treatment of her just before the meeting.  She states that everyone in the room witnessed Mr. Moran belittle her and that, throughout the meeting, she felt as if everyone was judging her because of Mr. Moran's behavior before the meeting and his refusal to return to the meeting.  (Doc. 23-7, Stewart Dep. at 76:3–25).

However, despite Plaintiff's assertion that numerous people witnessed Mr. Moran's alleged tirade, no person recalls the incident in the manner that Plaintiff describes.  Ms. Nelson states that she did not hear any raised voices from outside the meeting room immediately prior to Plaintiff's entry into the room.  (Doc. 23-4, Nelson Dep. at 38:16–23).  Further, Ms. Nelson had no independent recollection of Mr. Moran blocking Plaintiff from entering the meeting room.  (*Id.* at 57:2–7).  Ms. Ritzert did not see Mr. Moran block Plaintiff from entering the meeting room.  (Docs. 22-6, Ritzert Dec. at 3; 23-6, Ritzert Dep. at 19:1–11).  Ms. Hickman did not witness Mr. Moran physically obstructing Plaintiff's path into the meeting room, nor did she receive any independent information that would corroborate Plaintiff's version of the encounter.  (Doc. 22-2, Hickman Dec. at 7).  Her knowledge of the situation is limited to Mr. McTyre informing her via instant message

that Mr. Moran had left the meeting.  (*Id.* at 25:5–7).  Ms. Hickman spoke with Mr. Moran at his

desk and told him that it was being requested that he rejoin the meeting, but Mr. Moran declined

to rejoin due to his medical state at the time.  Ms. Hickman accompanied Mr. Moran to the nurse's

station.  (*Id.* at 25:17–27:10).

For his part, Mr. Moran states that he "did not physically touch her or prevent her from

entering the room. [He] asked her why are you here and she told [him] that her manager told her

to come. . . [He] told her that was fine. [He] got [his] items and left the meeting room."  (Doc. 22-

15, Moran Dec. at 7).  Mr. Moran denies that he yelled at Plaintiff, caused a scene at the meeting,

or blocked Plaintiff's access to the meeting.  (*Id.*).  David Chaffin recalls that:

> Mr. Guy Moran approached and spoke to the [Plaintiff] before entering the meeting.
> Mr. Guy Moran informed the [Plaintiff] that her attendance was not required at this
> particular session. [Plaintiff] did not respond to Mr. Guy Moran's statement to the
> [Plaintiff] and entered and attended the session in question.

(Doc. 22-8, Chaffin Dec. at 4).

## H.     Revocation of Command Center Lead Director position

Plaintiff's penultimate factual basis centers around a conversation that she had with her

supervisor that took place on August 14, 2015.[7]  Plaintiff maintains that, in the course of this

conversation, Ken McTyer approached her and stated that he and Ms. Hickman decided to offer

her the position of DCMS Command Center Lead Director.  (Doc. 22-1, Stewart Dec. at 7).

Plaintiff accepted the alleged offer on the spot.  (*Id.*).  Plaintiff then claims that shortly after she

accepted the Command Center Lead position, the offer was revoked and she was not given any

reasoning as to why it was revoked.  (*Id.*).

---

[7] There is some confusion as to whether this alleged incident took place in August 2015, as Plaintiff claims.
Ms. Hickman believes the incident may have taken place in August 2014.  (*See* Doc. 22-2, Hickman Dec.
at 8).

Defendant contends that Plaintiff was not actually offered the position. Mr. McTyer states that he "asked [Plaintiff] would she consider the position. I was not the approving authority." (Doc. 22-9, McTyer Dec. at 3). When asked if she recalled whether Plaintiff had ever been offered the DCMS Command Center Lead position, Ms. Hickman answered "No." (Doc. 23-2, Hickman Dep. at 33:17–19). Additionally, Ms. Hickman states that she had no "involvement with removing [Plaintiff's] name from consideration" for the Command Center Lead position and that she was unaware of "any involvement Mr. Moran had with this decision". (Doc. 22-2, Hickman Dec. at 8–9). Further, Mr. Moran stated that he was "not aware" of Plaintiff being offered the Command Center Lead position. (Doc. 23-3, Moran Dep. at 94:6–14). When asked if he was "aware that the [Command Center Lead position] was offered to [Plaintiff] and then withdrawn within 24 hours[,]" Mr. Moran responded: "I heard that. I read that. But I was not aware of it" at the time. (*Id.* at 94:18–22).

## I.      Reprisal for Pointing out Security Flaws

Plaintiff last asserts that she was retaliated against for pointing out security flaws in the systems on which she worked. Plaintiff states that in July 2013 and again in March 2014, she notified Mr. Moran of "overreaching security access flaws and a flaw where operations gained access to date and files" were subject to manipulation. (Doc. 22-1, Stewart Dec. at 7). Plaintiff asserts that she also voiced concerns to Ms. Ritzert and Mr. Hansen about these security issues sometime in 2014. Shortly thereafter, Mr. Moran changed her work assignment and she was removed as the ISSM for Mid-Tier, effectively halving her job responsibilities. Plaintiff asserts that Mr. Moran removed the ISSM for Mid-Tier role from her as a way to punish Plaintiff for pointing out these security flaws. When questioned about the situation, Mr. Moran stated that he

was already aware of the issues and some of the items mentioned by Plaintiff were already being worked on.  (Doc. 22-15, Moran Dec. at 8).

Defendant does not dispute that it was within Plaintiff's job responsibilities to disclose security flaws and unauthorized access to DFAS.  (Doc. 23-2, Moran Dep. at 80:11–14).  Further, Defendant insists that it had no problem with Plaintiff pointing out these security flaws (*Id.* at 80:20–21); rather, Defendant seems to have a problem with the time, place, and manner that Plaintiff chose to point out these security flaws.  In her deposition, Ms. Ritzert states:

> I felt that Doris was  -- she was making comments regarding flaws in the system and I have no problem with that. But the purpose of the meeting that I was discussing was to put controls together so that we could actually come up with tests to identify those flaws. So I just felt that she was trying to point out those flaws before we actually got there.

(Doc. 23-6, Ritzert Dep. at 39:22–40:5).  When asked why this meeting was the improper place to disclose the security flaws, Ms. Ritzert responded:

> We were meeting with Ernst & Young, the purpose of that meeting was to discuss our system, and their job was to help us set up these controls, these FISCAM controls. And so that meeting was to discuss our system so they had an understanding of what our system was about, so that they could assist us in setting up those controls.

(*Id.* at 40:24–41:6).  In her sworn declaration, Ms. Ritzert states that Plaintiff used the Ernst & Young FISCAM testing meeting as a:

> forum to point out those issue that she saw as flaws in the system security. This was not the place or time for this type [of] discussion. Additionally, Ms. Stewart was making comments without fully understanding or investigating the facts. She had an agenda in that meeting and it was not FISCAM. Her behavior put the rest of us on defense, making the meeting uncomfortable as we did not know when an attack was coming our way. Ms. Stewart got up and walked out about 3/4 of the way through the discussion . . . and did not return. After her departure, discussions were very productive, informative and without conflict.

(Doc. 22-6, Ritzert Dec. at 3–4).

Defendant has now moved for summary judgment on all of Plaintiff's claims.

## II. STANDARD OF REVIEW

Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berry v. Supervalu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence" in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact

sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

When ruling on a Motion for Summary Judgment the Court "need only consider the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is not obligated to sift through the voluminous record to find evidence favorable to one party's case. *Fullen v. City of Columbus*, No. 2:08-cv-263, 2011 WL 1303639, at *4 (S.D. Ohio Mar. 31, 2011) (Watson, J.), *aff'd*, 514 F. App'x 601 (6th Cir. 2013) (citing *Newswick v. CSX Transp., Inc.*, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008)). Furthermore, a "declaration used to support or oppose a motion must be made on personal knowledge, [and] set out facts that would be admissible in evidence . . . ." Fed. R. Civ. P. 56(c)(4).

## III.  DISCUSSION

Plaintiff has brought forth nine factual allegations under three different causes of action—disparate treatment discrimination, hostile work environment, and retaliation—alleging that Defendant has violated Title VII. Title VII states that it is an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of [her] race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1). Likewise, it is unlawful for an employer to take retaliatory measures against its employees because she "has made a charge . . . or participated in any manner in any in an investigation" under Title VII. 42 U.S.C. § 2000e-3(a). However, the United States Supreme Court reminds courts that Title VII is not a tool to resolve the "petty slights or minor annoyances" that are so common in the workplace, *Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 68 (2006), for Title VII is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 80 (1998).

The Defendant contends that it is entitled to summary judgment in its favor on all of Plaintiff's claims. Defendant argues that Plaintiff cannot establish all necessary elements of a *prima facie* case of workplace discrimination. (Doc. 22, Mot. at 35–36). Similarly, Defendant states that Plaintiff has failed to establish a *prima facie* showing of a hostile work environment. (*Id.* at 49–52). Finally, Defendant again asserts that Plaintiff has not and cannot sufficiently demonstrated a *prima facie* retaliation case. (*Id.* at 58). Plaintiff maintains that there remains a genuine issue of material fact as to all of her claims and, as such, summary judgment would be improper. The Court will address all of Plaintiff's claims in turn.

## A.     Disparate Treatment

Plaintiff alleges that she received disparate treatment because of her race, color, and sex; Plaintiff asserts that the nine factual allegations contained her Complaint all demonstrate illegal discrimination imputable to the Defendant. For its part, Defendant denies Plaintiff's allegations and maintains that summary judgment is proper on all nine of Plaintiff's discrimination claims as there is no genuine issue of material facts on which a jury may deliberate. Plaintiff correctly points out that "[t]he ultimate issue in any disparate treatment case is whether the complaining party was *intentionally* discriminated against due to his or her membership in a statutorily protected class." (Doc. 30, Resp. at 3) (emphasis in original). And for the reasons that follow, the Court finds that Plaintiff has failed to show that Defendant intentionally discriminated against her due to her race, color, and/or sex.

When there is no direct evidence that a defendant's motivation was discriminatory, a plaintiff must prove discrimination through "circumstantial evidence that is founded on a *prima*

*facie* demonstration of discrimination." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973). As direct evidence is "evidence that proves the existence of a fact without requiring any inferences," *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citations omitted), Plaintiff has not proffered to the Court direct evidence that Defendant's motivation was discriminatory; as such, the Court shall apply the burden-shifting analysis laid out in *McDonnell Douglas*.

Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case of discrimination. *Fullen v. City of Columbus*, 514 F. App'x 601, 605 (6th Cir. 2013) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009)). To establish a *prima facie* case of workplace discrimination, a plaintiff must establish that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the job; (3) [s]he suffered an adverse employment decision; and (4) [s]he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *White v. Baxter Healthcare Corp.*, 533 F3d 381, 391 (6th Cir. 2008) (citations omitted).

If the plaintiff establishes a *prima facie* showing of discrimination, the burden then shifts to the defendant to provide legitimate and non-discriminatory reasons for its acts. The burden shifts back to the plaintiff to demonstrate that the defendant's proffered reasons are mere pretext for discrimination. *See Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).

To establish pretext, a plaintiff may offer evidence that demonstrates defendant's proffered reason: "(1) has no basis in fact, (2) did not actually motivate the action, or (3) was insufficient to warrant the action." *Horn v. City of Cleveland*, 674 F. App'x 511, 515 (6th Cir. 2017) (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012)). The plaintiff bears the burden of demonstrating that the defendant's "reasons (each of them, if the reasons

independently caused [the] employer to take the action it did) are not true." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir. 1998) (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)).  A proffered reason is not considered pretext unless plaintiff shows "the reason was false, and that discrimination was the real reason." *Seeger*, 681 F.3d at 285 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).  Thus, irrespective of the method a plaintiff uses to rebut the defendant's reasons, the plaintiff bears the burden of producing "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant [] intentionally discriminated against" her.  *Seeger*, 681 F3d at 285 (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011)) (alteration in original and internal quotes omitted).

Defendant has not disputed the first and second elements of the *prima facie* showing of a discrimination case.  (*See* Doc. 22, Mot. at 36).  Instead Defendant argues that Plaintiff cannot establish that she: 1) suffered an adverse employment action; and 2) was treated less favorably than similarly situated non-protected co-workers.  (*Id.* at 41).

Plaintiff asserts that the adverse employment actions fall into two categories: 1) Defendant attempted to manufacture a "negative job performance record for Plaintiff, as a preliminary step to terminating her employment," and 2) Defendant removed Plaintiff's job responsibilities as the first step in terminating Plaintiff's employment.  (Doc. 30, Resp. at 7).

An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 798 (6th Cir. 2004)*, aff'd,* 548 U.S. 53 (2006) (citation omitted).  "[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment

decisions . . . ." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996). Such a reassignment may rise to the level of an adverse employment action "if it constitutes a demotion evidenced by 'a less distinguished title, a material loss of benefits, *significantly diminished* material responsibilities, or other indices that might be unique to a particular situation.'" *Burlington N. & Santa Fe Ry.*, 364 F.3d at 797 (citing *Kocsis*, 97 F.3d at 886) (emphasis added). Further, "*de minimis* employment actions are not materially adverse and, thus, not actionable." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000)). "The employment action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities'"; as such, a mere "bruised ego" does not amount to an adverse employment action. *Creggett v. Jefferson Cty. Bd. of Educ.*, 491 F. App'x 561, 565 (6th Cir. 2012) (citation omitted); *Burlington N. & Santa Fe Ry.*, 364 F.3d at 797 (citation omitted).

To be considered similarly-situated, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment[,]" rather, "the plaintiff and the employee with whom the plaintiff seeks to compare . . . herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commw. Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1996), *abrogated in part by Carter v. Toyota Tsusho America, Inc.*, 529 F. App'x 601 (6th Cir. 2013)) (emphasis in original and footnote omitted). A similarly-situated individual "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). These

factors are not "rigid requirements" but are merely factors for the court to consider.[8] *Henry v. Abbott Labs.*, 651 F. App'x 494, 501 (6th Cir. 2016); *see also Ercegovich*, 154 F.3d at 352. Plaintiff bears the burden of establishing that the individual with whom she compares herself is similar to her "in all relevant aspects." *See id.* "[G]eneralized and vague allegations" are insufficient. *Id.* at 147.

Assuming that Plaintiff can establish a *prima facie* case of unlawful workplace discrimination, Defendant argues that Plaintiff has not submitted evidence that shows that Defendant's legitimate and non-discriminatory explanations for its actions are pretext for discrimination. (*See* Doc. 31, Rep. at 24). There are three ways that a plaintiff may establish the pretexual nature of an employer's stated reason for an adverse employment action: "(1) the reason has no basis in fact, (2) the reason did not actually motivate the [employment action], or (3) the reason was insufficient to motive the [employment action]." *Alberty v. Columbus Twp.*, 730 F. App'x 352, 361 (6th Cir. 2018) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1087 (6th Cir. 19994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)). "In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them if the reasons independently caused [the] employer to take the action it did) are not true.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir. 1998) (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)). "[A] reason cannot be pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger*, 681 F.3d at 285 (alteration omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Therefore, irrespective of the method a plaintiff uses to rebut

---

[8] "Courts should not assume, however, that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich*, 154 F3d at 352.

defendant's reasons, a plaintiff "always bears the burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discrimination against h[er]." *Id.* (alterations omitted).

The Court finds that all nine of Plaintiff's discrimination claims fail for two reasons. First, Plaintiff cannot establish a *prima facie* case of race, color, or gender discrimination. Second, even if Plaintiff established the *prima facie* case of workplace discrimination, she has not proffered to the Court evidence that supports the conclusion that Defendant's legitimate and non-discriminatory reasons are pretextual. As such, and for the reasons more thoroughly discussed below, Defendant's Motion for Summary Judgment on Plaintiff's disparate treatment claims is **GRANTED**.

### 1. Denial of Certification

Plaintiff has pointed to only one certification that she has been denied, the Security Plus clearance. However, Plaintiff has failed to demonstrate that: 1) being denied the Security Plus certification was an adverse employment action; and 2) that a similarly situated individual outside of Plaintiff's protected classes was treated more favorably. Plaintiff asserts that her supervisor's denying her the opportunity to study for the Security Plus exam during work hours is evidence of adverse employment. (Doc. 30, Resp. at 7). The Court does not agree. Plaintiff has failed to provide the Court with record evidence, beyond her own beliefs and assumptions, that she was denied a Security Plus clearance due to her race, color, and/or sex. Rather, the record shows that Plaintiff was denied the Security Plus certification because she failed the necessary examination. Others too have been denied the certification Plaintiff sought because they failed the necessary examination.

Without corroborating evidence, Plaintiff's assertions that: 1) Defendant routinely allowed others to study for the examination during workhours; 2) Mr. Moran and Ms. Hickman conspired to assign Plaintiff more work so to prevent her from studying for the examination; and 3) some entity within the Department of Defense changed the format of the Security Plus certification examination to block Plaintiff from attaining a Security Plus clearance, are insufficient to form a *prima facie* case of discrimination.

###   2.   Removal from ISSM

Plaintiff argues that her removal as ISSM for DCMS amounts to disparate treatment. The Court does not agree. Even taking Plaintiff's assertion that she was removed as the ISSM for Mid-Tier because Mr. Moran was disgruntled over Plaintiff pointing out and resolving perceived security flaws in the Mid-Tier system, such a reason is not predicated upon Plaintiff's race, color, or sex. Thus, because Plaintiff has failed to direct the Court to record evidence that suggests that her removal as ISSM for Mid-Tier was based upon her belonging to a protected class, this portion of Plaintiff's claim necessarily fails.

Further, even if Plaintiff could establish a *prima facie* showing of discrimination based upon the attempted bifurcation of the ISSM position, Defendant has proffered to the Court a legitimate and non-discriminatory reason for the action. Mr. Moran stated that he sought to bifurcate the ISSM position into two roles because working on both systems created more work than one person could effectively handle. (*See* Doc. 23-3, Moran Dep. at 31:25–32:24; 22-15, Moran Dec. at 7). Plaintiff herself seems to give legitimacy to this explanation as Plaintiff contends that, due to her heavy workload as ISSM for DCMS, she was unable to sufficiently study for the Security Plus examination. As such, Plaintiff has failed to rebut Defendant's neutral and non-discriminatory reason for removing half of her workload.

Turning to Plaintiff's argument that her complete removal from the ISSM role on June 11, 2014, also amounted to discrimination, the Court disagrees. Plaintiff's removal from ISSM a mere 19 days before her term was set to expire was, at most, *de minimis* and not actionable under Title VII. Importantly, record evidence indicates that Plaintiff did not—and did not intend to—take the examination a second time in order to remain in her ISSM position. (Doc. 22-2, Hickman Dec. at 2). As such, Plaintiff cannot establish a *prima facie* showing of discrimination when: 1) the System Manager attempted to bifurcate DCMS's ISSM position in April 2014 and halved Plaintiff's job duties; and 2) she was completely removed from the ISSM position on June 11, 2014.

### 3. Withdrawal of Meaningful Work

As outlined *supra*, Plaintiff complains of four instances which she states evidence Defendant's discriminatory removal of meaningful work: 1) the Green Belt project; 2) the alleged behavior of Mr. Moran to frustrate Plaintiff's ability to do her job; 3) denial of access to certain computer systems; and 4) Plaintiff's training of Kirk Shelby. For the reasons that follow, the Court finds in favor of the Defendant.

First, Plaintiff contends that the Green Belt project coach's lack of involvement in the project amounted to unlawful discrimination. The Court does not agree. Plaintiff admits that she has suffered no negative consequences as a result of the original project coach's lack of involvement with the project. (Doc. 23-7, Stewart Dep. at 61:13–18, 62:14–20). Without a showing of some *actual* adverse employment action, Plaintiff cannot establish the third element of a *prima facie* showing of disparate treatment because of her involvement in the Green Belt project. As such, the Court finds that Plaintiff has not met her burden on this portion of her third disparate treatment claim.

Taking Plaintiff's assertion that her lack of access to the eMASS system frustrated her ability to perform the special assignment as true, the Court still finds that Plaintiff's lack of access to the eMASS system does not establish a *prima facie* case of disparate treatment. Plaintiff admits that she was able to complete the workload without access to the eMASS system. (*See* Doc. 23-7, Stewart Dep. at 42:14–24; *see also* Doc. 23-5, Parsons Dep. at 70:15–72:2). Additionally, Plaintiff has failed to direct the Court to record evidence upon which a reasonable jury could find that Plaintiff's lack of access to eMASS was based upon her race, color, or sex. Thus, this portion of Plaintiff's third claim necessarily fails.

The Court next turns to Plaintiff's contention that Mr. Moran's withdrawal of work amounts to discrimination. The Court is not persuaded. Plaintiff's argument is primarily predicated upon Mr. Moran's lack of assigning her "meaningful work" in late 2015. Yet the record reflects that when Plaintiff contacted her supervisor—at that time, Mr. Gross—to inform him that she lacked "meaningful work," Mr. Gross promptly set out to address the situation. Shortly after Mr. Gross's and Plaintiff's in-person meeting, Mr. Gross emailed Mr. Moran asking about what Plaintiff's current assignments were and instructing Mr. Moran to assign Plaintiff "meaningful work," if Mr. Moran had not already done so. (Doc. 22-4, Gross Dep. Ex. 10). Mr. Moran responded within the hour stating he would look into what he could assign to plaintiff given her skill set. (*Id.*). A few days later, Mr. Gross again reached out to Mr. Moran urging him to reconsider his position that he did not have any suitable work to assign to Plaintiff. Within a week of that exchange, Plaintiff was appointed DCMS Main Frame Configuration and Release Manager and was asked to participate on the Black Belt project. Therefore, less than a month passed between Plaintiff informing Mr. Gross that she had no "meaningful work" and Plaintiff being assigned "meaningful work." It is also important to note that Mr. Moran was not in Plaintiff's

supervisory chain. It appears Mr. Moran was at least partially in charge of assigning work to Plaintiff, but there is no indication in the record that Mr. Moran ever had supervisory authority over Plaintiff. Rather, that authority remained with Mr. Gross, Mr. McTyer, or Mr. Hansen. (*Id.* at 19:20–20:15; Doc. 22-9, McTyer Dec. at 2; Doc. 22-1, Stewart Dep. at 93:15–19). Ultimately, the Court finds this three-and-a-half-week period in which Plaintiff lacked "meaningful work" to be, at most, *de minimis* and not actionable under Title VII.

Turning to Plaintiff's last complaint contained within her third discrimination claim, the Court finds that Defendant requiring Plaintiff to train Mr. Shelby insufficient to establish a *prima facie* case of workplace discrimination. Alternatively, even if Plaintiff were able to establish a *prima facie* showing of disparate treatment, Plaintiff has failed to rebut Defendant's legitimate and non-discriminatory reasons for the action. Plaintiff cannot establish that she suffered an adverse employment action when Defendant required her to train Kirk Shelby. During the training period, Mr. Shelby, temporarily, assumed Plaintiff's role as the lead CM. While Mr. Shelby served in Plaintiff's role, Plaintiff served in Mr. Shelby's role as backup CM. During Plaintiff's temporary tenure as backup CM, she still retained some of her job responsibilities. Further, Plaintiff's salary did not decrease during this role reversal and neither did she lose any other material benefit. The Court acknowledges that Plaintiff's home system workload decreased while she served as backup CM during Mr. Shelby's training period; however, Plaintiff's supervisor assigned her "additional workload" to supplement her home system workload. (Doc. 23-5, Parsons Dep. at 85:15–19). Thus, while Plaintiff's workload may have been different during this time period, it was not significantly diminished. As such, the Court finds that to the extent that Plaintiff suffered from an adverse employment action while serving as Mr. Shelby's backup, such employment action was *de minimis*.

Even assuming *arguendo* that Plaintiff established a cognizable disparate treatment claim due to her and Mr. Shelby's temporary role reversal, Plaintiff has failed to demonstrate that Defendant's legitimate and non-discriminatory reasons for this are mere pretext for discrimination. Defendant states Mr. Shelby temporarily assumed Plaintiff's role as primary Configuration Manager so to adequately familiarize himself with the role so if Plaintiff was unavailable, somebody, who was trained in that position, was available should an emergency arise. (*See* Doc. 23-5, Parsons Dep. at 84:6–85:4). Plaintiff has not drawn the Court's attention to any record evidence that demonstrates that this facially non-discriminatory reason is pretextual.

### 4.    Denied Access to Special Assignments and Promotions

The Court will first address Plaintiff's allegation that she was denied promotions due to her race, color, and/or sex. Plaintiff has failed to draw the Court's attention to any specific promotion[9] that she was denied. (*See* Doc. 30, Resp. at 7–12). Instead, Plaintiff generally alleges that despite being highly successful in her job, she has been passed over for promotions. (*Id.* at 5–6).

A review of the record shows that Plaintiff applied for one GS-13 promotion during the timeframe that the Complaint covers. Defendant used a competitive selection process to choose the candidate for promotion. (Doc. 23-7, Stewart Dep. at 176:16–19). But Plaintiff has failed to direct the Court to record evidence that Defendant's decision to hire another qualified candidate over the Plaintiff amounts to illegal discrimination. Essentially Plaintiff complains that because she was not interviewed, despite being "found qualified and referred," that Defendant's decision to not interview her and select another for the promotion was discriminatory. (*See* Doc. 23-7,

---

[9] Plaintiff complains of one specific promotion that she alleges was offered to her and then subsequently withdrawn due to Mr. Moran's interference. However, Plaintiff has brought that allegation in her eighth claim and, as such, will be discussed below.

Stewart Dep. at 176:16–179:2). Plaintiff has not pointed the Court to record evidence from which a reasonable jury could conclude that Defendant's choice to promote someone other than Plaintiff was predicated upon Plaintiff's race, color, and/or sex.

The Court now turns to Plaintiff's complaint that she was denied the opportunity to work on special assignments because of her race, color, and/or sex. In Plaintiff's Response to Defendant's Motion for Summary Judgment, Plaintiff states: "Plaintiff has extensive experience and was tasked by Defendant to perform multiple special assignments with other offices, departments, and/or branches outside of her home system." (Doc. 30, Resp. at 6) (citations omitted). Plaintiff makes similar admissions throughout the record. (*See, e.g.,* Doc. 22-1, Stewart Rebut. at 19 (Ms. Hickman "moved me to outside special assignments over and over again."); Doc. 22-1, Stewart Dep. at 93:6–11 ("I was able to do the workload and was able to do it well . . . to the point where again, that is evidenced with the special assignments that I was sent to. I was sent in help with ISSM's workload.")). As such, the Court finds that, contrary to Plaintiff's assertion, Defendant has not denied Plaintiff access to special assignments. Plaintiff has failed to direct the Court to any specific special assignment Defendant did not allow Plaintiff to work; thus, this coupled with Plaintiff's statements that Defendant has assigned multiple special assignments demonstrates that Plaintiff has failed to establish a *prima facie* case of disparate treatment on this portion of her discrimination claim.

5. **False Accusations**

Plaintiff's fifth disparate treatment claim is predicated upon Mr. Moran allegedly making false accusations about Plaintiff to other individuals. Plaintiff has failed to demonstrate how, even if Plaintiff's allegation is taken as true, such false allegations amount to an adverse employment

action.  Such "false allegations" never culminated in a significant change in Plaintiff's employment status.

### 6.    System Manager's Offensive Conduct

Plaintiff's sixth cause of action focuses solely on inappropriate comments that Mr. Moran allegedly made to or about Plaintiff.  Plaintiff alleges that Mr. Moran made several comments that were racially charged, sexually motivated, or threatening.  However, even if Plaintiff's allegations are taken as true, she cannot succeed on this claim as Plaintiff has failed to demonstrate that the unsavory remarks of a co-worker amount to or resulted in a significant change in Plaintiff's employment status.

### 7.    Denied Access to Meeting

Plaintiff's next claim is based upon Mr. Moran allegedly impeding Plaintiff's entrance into a May 2015 audit readiness meeting.  Taking Plaintiff's version of the event as true, the Court finds that Plaintiff has nonetheless failed to establish how Mr. Moran's actions constitute an adverse employment action.  Plaintiff was delayed in entering the room by some short amount of time and there is no indication that Mr. Moran's alleged actions caused Plaintiff to be late for the meeting.  The record also reflects that Plaintiff voluntarily chose to leave the meeting early despite Mr. Moran never returning to the meeting after the encounter in the doorway.  The Plaintiff has not proffered facts upon which a reasonable jury could conclude that such events amount to an adverse employment action on Defendant's behalf.

### 8.    Revocation of Command Center Lead

Taking Plaintiff's version of the events as true, the reneging of the Command Center Lead offer does not amount to disparate treatment.  Plaintiff does not explain how the Command Center Lead position would have materially affected her salary, benefits, or responsibilities; she stated

only that such a position is a platform for "very high visibility" as a stepping stone to advancement to a GS-13 position. (*See* Doc. 23-7, Stewart Dep. at 179:17–180:9). For an action to be adverse, an employee must demonstrate some tangible negative consequence rather than illusory damages. Plaintiff has failed to demonstrate what material benefits she would have gained had the Command Center Lead promotion not been reneged. As such, Plaintiff has failed to establish the third necessary element of a *prima facie* showing of disparate treatment.

### 9. Reprisal for Addressing Security Flaws

By Plaintiff's own admission, Defendant's employee allegedly took no negative action against Plaintiff because she pointed out security flaws. As such, Plaintiff has necessarily failed to show how such "reprisal" against her was predicated upon her race, color, and/or sex, as is required to establish a cognizable disparate treatment claim under Title VII. Furthermore, Defendant has identified a legitimate and non-discriminatory reason for administering any reprisal against Plaintiff: Defendant states that Plaintiff's time, place, and manner of pointing out these security flaws was inappropriate as she chose to voice these security concerns during a meeting on a different matter in front of individuals who worked outside of the Department of Defense.

Even considering all of Plaintiff's allegations collectively, the Court finds that Plaintiff has failed to demonstrate how Defendant's actions caused a significant change in Plaintiff's employment status. Plaintiff continues to receive high marks in her employee evaluations; Defendant has accommodated her work schedule so to limit her exposure with Mr. Moran and other co-workers with whom Plaintiff does not have a collegial relationship; Defendant has not decreased Plaintiff's salary or significantly changed Plaintiff's responsibilities. Additionally, Plaintiff has failed to demonstrate how she was treated less favorably than individuals outside of her protected class who are similarly situated to her in all relevant aspects. As such, the Court

finds that Plaintiff's claims—either taken collectively or individually—do not support a *prima facie* showing of disparate treatment under Title VII; therefore, Defendant's Motion for Summary Judgment as to all of Plaintiff's disparate treatment claims is **GRANTED**.

**B.     Hostile Work Environment**

To succeed under a hostile work environment theory of discrimination, Plaintiff must demonstrate that: "(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [her] race, [color, and sex,] (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078–79 (6th Cir. 1999)) (footnote omitted). This test "has both objective and subjective components." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999); *see also Wade v. Automation Personnel Servs., Inc.*, 612 F. App'x 291, 296 (6th Cir. 2015) ("The conduct must be objectively hostile or abusive, and the victim must also subjectively regard the environment as abusive.") (citing *Knox v. Neaton Auto Prods. Mfg.*, 375 F3d 451, 459 (6th Cir. 2004); *Harris*, 510 U.S. at 21–22)). Further, "the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).

Plaintiff bases her claim on the same nine factual bases discussed in the Court's analysis of her disparate treatment claim. Defendant does not challenge that Plaintiff belongs to a protected group, but does challenge the remaining four elements necessary to bring a successful claim for hostile work environment.

1.	**Subject to Unwelcome Harassment**

Aside from Plaintiff's personal perception, there is no record evidence to lead a reasonable jury to reach the conclusion that the following factual bases were at all related to, or motivated by, Plaintiffs sex, race, or color: 1) her denial of a Security Plus certification; 2) her removal from the ISSM position; 3) Defendant not assigning her special assignments; 4) the revocation of a promotion; 5) Defendant's withdrawal of all meaningful work; and 6) being punished for pointing out security flaws.  However, the record supports the existence of a genuine issue of material facts as to whether Plaintiff suffered unwelcome harassment for those factual bases that pertain to the indisputably strained relationship between Plaintiff and Mr. Moran.  That tension existed between Mr. Moran and Plaintiff is clear from the testimony of nearly every declarant and/or deponent in this case.  It is not the role of the Court to make the factual determination as to whether this tension rose to the level of unwelcome harassment; such determination should remain with the factfinder. Accordingly, the Court finds that Plaintiff has sufficiently established that there is a genuine issue of material fact as to the factual bases that directly involve Mr. Moran's interactions with Plaintiff: 1) Mr. Moran's purported false accusations concerning the revocation of security credentials; 2) Mr. Moran's alleged offensive behavior; and 3) Plaintiff being barred from required meetings.

2.	**Severity or Pervasiveness of Alleged Harassment**

Even assuming *arguendo* that the remaining conduct Plaintiff has complained of was motivated by Plaintiff's sex, race, or color, these actions do not rise to the requisite level of severity or pervasiveness necessary to establish an actionable harm under Title VII.  The Sixth Circuit has explained that

> a plaintiff must demonstrate that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a

> reasonable person would find hostile or abusive is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter*, 59 F. App'x 678, 681 (6th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993)) (internal quotes and citations omitted); *see also Howard v. Bd. of Educ. of Memphis City Schs.*, 70 F. App'x 272, 282 (6th Cir. 2003). "In sum, the plaintiff's evidence must be sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the employee's ability to do his or her job." *Moore*, 171 F.3d at 1079 (citing *Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1256 (6th Cir. 1985)).

"'Simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale*, 523 U.S. at 81). "Isolated incidents may constitute discriminatory changes only if extremely serious." *Ault v. Oberlin Coll.*, 620 F. App'x 395, 400 (6th Cir. 2000) (quoting *Faragher*, 524 U.S. at 788) (internal quotes omitted). But a "work environment viewed as a whole may satisfy the legal definition of an abusive work environment . . . even though no single episode crosses the Title VII threshold." *Williams*, 187 F.3d at 564.

The Court does not find any of the remaining instances—considered alone or collectively—to be "severe or pervasive" enough to alter the conditions of Plaintiff's employment, and, hence, actionable under Title VII. Rather, Mr. Moran's conduct and words directed at Plaintiff was much more akin to "personal conflict." While Mr. Moran may have created an uncomfortable situation by confronting Plaintiff prior to the May 13, 2015 audit readiness meeting, there is no evidence to suggest that his conduct was so severe or pervasive to alter Plaintiff's

conditions of employment or create an abusive environment. The same is true of the "false accusations and threats" Mr. Moran's allegedly made about Plaintiff to Ms. Ritzert regarding the potential revocation of her security credentials. Ms. Ritzert's testimony reflects that Mr. Moran was simply reassuring her that neither Plaintiff, nor he, would revoke her security credentials. (Doc. 23-6, Ritzert Dep. at 17:21–18:21). Even if the Court were to afford the most beneficial interpretation of the conversation to Plaintiff, and Mr. Moran did tell Ms. Ritzert not to believe rumors being spread by Plaintiff, this conduct is relatively innocuous and certainly does not rise to the level of severe or pervasive. Mr. Moran's alleged comments concerning Denzel Washington, Lil' Wayne, and Plaintiff getting special assignments because she is pretty and wears pretty dresses are, if true, inappropriate at worst. The Sixth Circuit has held that offensive language is not necessarily actionable under Title VII because "Title VII was not meant to create a 'general civility code,' and the 'sporadic use of abusive language, gender-related jokes, and occasional teasing' are not sufficient to establish liability." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) (quoting *Faragher*, 524 U.S. at 788). Mr. Moran's comment regarding him "not having been to the gun rage lately" is even less actionable because there is absolutely no record evidence to indicate that the comment was directed at or in reference to Plaintiff.

The Court agrees with Defendant's contention that "[b]eing called an 'angry black woman,' more than once by a co-worker, in the workplace is, or could be objectively characterized as 'offensive.' However, a repeated, offensive comment does not come close to a level deemed 'severe or pervasive' by the [Sixth Circuit]." (Doc. 22, Mot. at 56) (citing *Phillips v. UAW International*, 854 F.3d 323, 328 (6th Cir. 2017) citing *Williams v. CSX Transp. Co.*, 643 F.3d 502, 513 (6th Cir. 2011) (finding no hostile work environment where defendant "call[ed] Jesse Jackson and Al Sharpton 'monkeys' and [said] that black people should 'go back to where [they] came

from'" among other racist comments); *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014) (no hostile work environment where plaintiff was subjected to race-based comments and his supervisor stood behind him and made a noose out of a telephone cord); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707‑08 (6th Cir. 2007) (fifteen racially-motivated comments and instances of disparate treatment over a two-year period were isolated, not pervasive, and therefore not actionable under Title VII)).

In sum, even when taken together, Mr. Moran's actions and words do not rise to the requisite level of "severe or pervasive" and Plaintiff has failed to set forth a *prima facie* claim for hostile work environment. As such, this Court need not consider whether Defendant knew of the alleged harassment and what steps were taken to address it. Defendant's Motion for Summary Judgment as to Plaintiff's hostile work environment claim is **GRANTED**.

## C.     Retaliation

As before, Plaintiff brings all nine of her factual allegations under Title VII's retaliation cause of action. Similarly, Plaintiff has failed to establish a *prima facie* showing of retaliation and, as such, the Defendant is entitled to summary judgment.

Title VII prohibits an employer from retaliating against an employee who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to bring a successful claim for retaliation under Title VII, a plaintiff must show "that the challenged action well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry.*, 548 U.S. at 54 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). However, retaliation does not encompass "trivial" harms; rather, a plaintiff must show material adversity. *Id.* While this is an objective standard, its application "often depends on a constellation of

surrounding circumstances, expectations, and relationship which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 69 (quoting *Oncale*, 523 U.S. at 81–82).

Title VII retaliation claims based on circumstantial evidence are subject to *McDonnell Douglas'* familiar burden shifting framework. *See Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017) (citing *McDonnell Douglas*, 411 U.S. at 802–04). Thus, Plaintiff must establish a *prima facie* case of retaliation; Defendant is afforded the opportunity to rebut any showing of a *prima facie* case with legitimate and nonretaliatory reasons for its actions; then the burden shifts back to Plaintiff to show that Defendant's reasons are mere pretext. *See id.* (citing *Evans v. Prof'l Transp., Inc.*, 614 F. App'x 297, 300 (6th Cir. 2015)).[10] The elements of a *prima facie* case of retaliation are:

> (1) That [s]he engaged in an activity protected by Title VII; (2) that the defendant knew of this exercise of [her] protected rights; (3) that the defendant consequently took an employment action adverse to plaintiff; and (4) that there is a causal connection between the protected activity and the adverse employment action.

*Strouss v. Mich. Dept. of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001); *see also Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co.*, 783 F.2d 50, 54 (6th Cir. 1986), *cert. denied*, 478 U.S. 1006 (1986). Establishing a *prima facie* case of retaliation is not an onerous endeavor. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).

---

[10] "If [Plaintiff] succeeds in making out the elements of a *prima facie* case of retaliation, the burden of production shifts [to the employer] to articulate a legitimate, non-retaliatory reason for the termination[]. If the [employer] satisfies its burden of production, the burden shifts back to [Plaintiff] to show that the reason was a pretext for retaliation. Although the burden of production shifts between the parties, the [Plaintiff] bear[s] the burden of persuasion through the process." *Mansfield*, 706 F. App'x at 236 (quoting *Evans*, 614 F. App'x at 300) (changes in original and internal quotes omitted).

1. **Prima Facie Case**

   a. **Title VII Protected Activity and Defendant's Knowledge of Protected Activity**

Defendants do not contest that Plaintiff satisfies the first two elements necessary to make a *prima facie* showing of retaliation. Plaintiff engaged in a Title VII protected activity by filing a complaint with the EEOC on September 14, 2015. Likewise, Defendant does not dispute, that Defendant became aware of Plaintiff's engagement in a protected activity on September 14, 2015. As such, the first and second prongs of Plaintiff's Title VII retaliation claim have been met.

   b. **Adverse Employment Action and Connection between Action and Protected Activity**

Defendant contends that there is no distinguishable difference between the alleged conduct of which Plaintiff complains of prior to her protected activity and the conduct that she alleges occurred after her participation in a protected activity. Plaintiff contends that the same nine factual bases she used to support her discrimination and hostile work environment claims raise genuine issues of material fact that should be submitted to a jury. (*See* Doc. 30, Resp. at 31).

Making all reasonable inferences in favor of the Plaintiff, the Court finds that Plaintiff has failed to demonstrate the existence of an adverse employment action. The Court is mindful that "[a] plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." *Spellman v. Ohio Dep't of Transp.*, 244 F. Supp. 3d 686, 703 (S.D. Ohio 2017) (Sargus, C.J.) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2010)). In *Burlington N. & Santa Fe Ry.*, the Supreme Court found that, for retaliation claims, an adverse employment action is any action that might deter a reasonable employee "from making or supporting a charge of discrimination." 548 U.S. at 68–69.

As such, the same conduct that does not qualify as an adverse employment action for discrimination claims can amount to an adverse employment action for retaliation claims.

Next, the Court notes that the vast majority of the alleged conduct relied upon by Plaintiff occurred before she filed her EEOC Complaint or commenced the present lawsuit. Specifically:

1) Plaintiff as denied her Security Plus certification in late-2013 or early-2014;
2) Plaintiff was removed from her appointment as Security manager in June 2014;
3) False accusations regarding the revocation of security credentials were allegedly made in February or March 2015;
4) Mr. Moran allegedly denied Plaintiff access to a meeting in May 2015;
5) Plaintiff's alleged offer for the Command Center Lead Director position was revoked in August 2015;
6) Plaintiff was allegedly reprised against for pointing out security flaws in 2013 or 2014; and
7) As discussed above, Plaintiff has failed to show that she was denied access to special assignments and/or promotions.

Plaintiff cannot feasibly connect an adverse employment action to her participation in a protected activity on the basis of these grounds. The only remaining viable grounds on which Plaintiff may base a claim for retaliation are: 1) removal of all meaningful work, and 2) ongoing offensive behavior by Mr. Moran.[11] Thus, the Court shall only consider those factual allegations related to the withdrawal of all meaningful work that Plaintiff alleges occurred after September 14, 2015.

Even assuming *arguendo* that Defendant's alleged withdrawal of all meaningful work and Mr. Moran's ongoing conduct (excepting his five, specifically alleged comments that were made prior to Plaintiff filing her EEOC Complaint) constitute an adverse employment action, Plaintiff has failed to show a causal connection between her protected activity and those actions. "In order to establish a causal connection between the protected conduct and the adverse action, a plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude

---

[11] It appears from the record that all five of Mr. Moran's specifically alleged comments occurred prior to September 2015, and Plaintiff does not specifically contend that any of the comments were made after September 2015. However, this factual basis is broad enough that the Court will consider other instances of alleged abuse/offensive behavior

that the adverse action would not have occurred but for [her] engagement in protected activity." *Mansfield*, 706 F. App'x at 236–37 (quoting *Russell v. Kloeckner Metals Corp.*, No. 3-13-0316, 2014 WL 1515527, at *3 (M.D. Tenn. Apr. 18, 2014)); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 359–60 (2013). Further, "vague and generalized" and "conclusory allegations are insufficient to establish causation." *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999).

The Court finds it telling that Plaintiff does not direct the Court's attention to any specific employment action undertaken by Defendant after Plaintiff filed her EEOC Complaint that was allegedly violative of Title VII. Rather, Plaintiff vaguely offers that "evidence set forth in [17 pages of her Response] create genuine issues of material fact regarding whether [Plaintiff] was subjected to retaliation for the filing of her EEO Complaint and the filing and litigation of this lawsuit." (Doc. 30, Resp. at 31). As noted above, the vast majority of the activity of which Plaintiff complains predates her filing of the EEOC Complaint. By simply arguing that Plaintiff was subject to unfair treatment before Plaintiff filed her EEOC Complaint, and that treatment persisted after the filing of her Complaint, without attempting to differentiate the nature of her treatment, Plaintiff fails to establish a causal nexus between the alleged conduct and the adverse employment action. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009) (finding that it was critical to the plaintiff's case that scrutiny increased after he filed an EEOC Complaint). Plaintiff's attempts to base her claims on Mr. Moran's treatment and withdrawal of meaningful work fail for the same reasons: Plaintiff generally alleges that Mr. Moran withdrew work from her and targeted her, but fails to allege that his behavior changed as a result of her filing her EEOC Complaint.

In addition, the record does not support Plaintiff's conclusory position that "most of the retaliatory actions, statements and/or omissions by Lee Gross and Abigail Parsons, Plaintiff's

supervisors, occurred after September 14, 2015. The Exhibits attached to the depositions of Lee Gross and Abigail Parsons, in particular, substantiate many of the retaliatory actions, statements and omissions by Lee Gross and Abigail Parsons." (Doc. 30, Resp. at 1). Rather, a review of those particular documents reveal predominantly positive job reviews of Plaintiff, considerable efforts made by Plaintiff's supervisors to alleviate any of Plaintiff's concerns regarding workload, and efforts made to procure access to systems for Plaintiff—or explanations as to why access was not necessary. One such example of these efforts was detailed at length *supra* in Sections I.C.3 and III.A.3 (October/November 2015 emails from Mr. Gross to Mr. Moran directing him to assign meaningful work to Plaintiff).

In sum, even if Plaintiff is able to substantiate the existence of an adverse employment action, she has failed to make a *prima facie* showing of retaliation because she cannot demonstrate a causal connection between the protected activity and the adverse employment action. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim is **GRANTED**.

## IV. CONCLUSION

Undoubtedly, there is conflict between Mr. Moran and Ms. Stewart; however, Plaintiff has failed to identify evidence creating a genuine issue of material fact as to several necessary elements of her Title VII claims. Thus, for the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 22) is **GRANTED**.

The Clerk shall remove Document 22 from the Court's pending motions list and enter final judgment in favor of Defendant.

**IT IS SO ORDERED.**

         */s/ George C. Smith*
         **GEORGE C. SMITH, JUDGE**
         **UNITED STATES DISTRICT COURT**